**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, *Plaintiff-Appellee*, v. AT&T MOBILITY LLC, a limited liability company, *Defendant-Appellant.* | No. 15-16585 D.C. No. 3:14-cv-04785-EMC OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted June 17, 2016
San Francisco, California

Filed August 29, 2016

Before: Richard R. Clifton, and Sandra S. Ikuta, Circuit
Judges, and William Q. Hayes,[*] District Judge.

Opinion by Judge Clifton

---

[*] The Honorable William Q. Hayes, United States District Judge for the
Southern District of California, sitting by designation.

2          FTC V. AT&T MOBILITY

## SUMMARY[**]

### Federal Trade Commission Act

The panel reversed the district court's denial of AT&T Mobility LLC's motion to dismiss, and remanded for an entry of an order of dismissal in an action brought by the Federal Trade Commission under section 5 of the FTC Act that took issue with the adequacy of AT&T's disclosures regarding its data throttling plan, under which AT&T intentionally reduced the data speed of its customers with unlimited mobile data plans.

Section 5 of the FTC Act contains an exemption for "common carriers subject to the Acts to regulate commerce." 15 U.S.C. § 45(a)(2). The panel held that AT&T was excluded from the coverage of section 5 of the FTC Act, and FTC's claims could not be maintained. Specifically, the panel held that, based on the language and structure of the FTC Act, the common carrier exception was a status-based exemption and that AT&T, as a common carrier, was not covered by section 5.

### COUNSEL

Michael K. Kellogg (argued) and Mark C. Hansen; Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C.; David L. Anderson, Sidley Austin LLP, San Francisco, California; for Defendant-Appellant.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Joel Marcus (argued), Director of Litigation; Matthew M. Hoffman and David L. Sieradzki, Attorneys; David C. Shonka, Acting General Counsel; Federal Trade Commission, Washington, D.C.; Evan Rose, Matthew D. Gold, and Linda K. Badger, Federal Trade Commission, San Francisco, California; for Plaintiff-Appellee.

## OPINION

CLIFTON, Circuit Judge:

Through a practice referred to by the Federal Trade Commission as "data throttling," AT&T Mobility LLC intentionally reduces the data speed of its customers with unlimited mobile data plans.[1]  A throttled customer receives data at a substantially reduced speed during a given billing cycle once the customer's data usage during that billing cycle exceeds a threshold determined by AT&T.  Unlimited data plan customers are throttled without regard to real-time network congestion.

The FTC filed a complaint against AT&T under section 5 of the FTC Act, 15 U.S.C. § 45(a), taking issue with the adequacy of AT&T's disclosures regarding its data throttling program.  The central issue before us is whether AT&T is covered by section 5, which exempts, among others, "common carriers subject to the Acts to regulate commerce." We conclude that AT&T is excluded from the coverage of section 5, and that the FTC's claims cannot be maintained.

---

[1] The facts presented here are those alleged by the FTC in its Complaint. We will refer to the practice by the FTC's term, data throttling.

I.

AT&T offers mobile voice service and mobile data service to its customers. Mobile data service allows customers with smartphones to access the internet using AT&T's mobile data network. Customers with mobile data service can, among other things, send and receive email, use GPS navigation, and stream videos.

In 2007, AT&T became the exclusive service provider for the Apple iPhone in the United States. At that time, AT&T began offering iPhone customers an "unlimited" mobile data plan, allowing users access to an unlimited amount of data for a fixed monthly rate. Starting in June 2010, however, AT&T stopped offering unlimited mobile data plans to new customers. Since then, it has required new customers to select one of various "tiered" data plans, under which a customer has a set data allowance per month for a fixed monthly rate and incurs additional charges for any data usage in excess of the set data allowance. Customers with preexisting unlimited data plans were grandfathered into the new system to avoid encouraging them to switch to a different service provider.

In July 2011, AT&T decided to begin reducing the speed at which unlimited data plan users receive data on their smartphones. Under AT&T's data throttling program, unlimited data plan customers are throttled for the remainder of a billing cycle once their data usage during that cycle exceeds a certain threshold. Although AT&T attempts to justify this program as necessary to prevent harm to the network, AT&T's throttling program is not actually tethered to real-time network congestion. Instead, customers are subject to throttling even if AT&T's network is capable of

carrying the customers' data.  AT&T does not regularly throttle its tiered plan customers, no matter how much data those customers use.

The FTC contends that AT&T failed to adequately inform its customers of its data throttling program.  It asserts two claims against AT&T under section 5 of the FTC Act, pursuant to which the FTC may "prevent persons, partnerships, or corporations, except . . . common carriers subject to the Acts to regulate commerce . . . from using . . . unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(2).

In Count I, the FTC asserts that AT&T's imposition of data speed restrictions on customers with contracts "advertised as providing access to unlimited mobile data" and without terms "provid[ing] that [AT&T] may modify, diminish, or impair the service of customers who use more than a specified amount of data" is an unfair act or practice. In Count II, the FTC asserts that AT&T's failure to adequately disclose that it "imposes significant and material data speed restrictions on unlimited mobile data plan customers who use more than a fixed amount of data in a given billing cycle" is a deceptive act or practice.

AT&T filed a motion to dismiss the FTC's Complaint, contending that it is immune from liability under section 5 because of its status as a common carrier.  The FTC opposed the motion, arguing that AT&T is not exempt from liability for violations in connection with its mobile data service, a non-common carrier service, because the common carrier exemption in section 5 protects entities with the status of common carrier only to the extent that the service in question is a common carrier service.

6                    FTC v. AT&T MOBILITY

While the motion to dismiss was pending, the Federal Communications Commission reclassified mobile data service from a non-common carrier service to a common carrier service.[2]  In response, AT&T argued to the district court that the FCC's Reclassification Order, even though prospective in application, stripped the FTC of authority to maintain its claims against AT&T, even as to past violations.[3]

It is undisputed that AT&T is and was a "common carrier[] subject to the Acts to regulate commerce" for a substantial part of its activity, but prior to the FCC's Reclassification Order, its mobile date service was not identified and regulated by the FCC as a common carrier service.

The district court denied AT&T's motion to dismiss.  *See FTC v. AT&T Mobility LLC*, 87 F. Supp. 3d 1087 (N.D. Cal. 2015).  It rejected AT&T's view of the common carrier exemption, concluding that it applies "only where the entity has the status of common carrier and is actually engaging in common carrier activity." *Id.* at 1104  The district court also rejected AT&T's argument that the FCC's Reclassification

---

[2] This classification was recently upheld by the D.C. Circuit in *U.S. Telecom Ass'n v. FCC*, 2016 WL 3251234 (D.C. Cir. June 14, 2016).

[3] The FCC has also taken issue with AT&T's data throttling program. On June 17, 2015, it issued a Notice of Apparent Liability, finding that AT&T "apparently willfully and repeatedly violated the [FCC's] Open Internet Transparency Rule by: (1) using the misleading and inaccurate term 'unlimited' to label a data plan that was in fact subject to prolonged speed reductions after a customer used a set amount of data; and (2) failing to disclose the express speed reductions that it applied to 'unlimited' data plan customers once they hit a specified data threshold." *See In the Matter of AT&T Mobility, LLC*, 30 F.C.C. Rcd. 6613 (2015).

Order stripped the FTC of authority to pursue its claims. *Id.* at 1102–04. According to the district court, the Reclassification Order had no effect on the FTC's authority over AT&T's past alleged misconduct. *Id.* at 1104.

AT&T requested that the district court certify its order denying the motion to dismiss for immediate appeal pursuant to 28 U.S.C. § 1292(b). The district court agreed but did not stay the proceedings before it. Following the district court's certification order, AT&T filed an unopposed petition for permission to appeal, which this court granted.

## II.

We review a district court's ruling on a motion to dismiss de novo. *Colony Cove Properties, LLC v. City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011).[4]

## A.

Section 5 of the FTC Act, on which the FTC relies, contains an exemption for "common carriers subject to the

---

[4] AT&T brought its motion pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, stating that the issue before the district court was "[w]hether th[e] Court possesses subject-matter jurisdiction over the FTC's complaint, notwithstanding the fact that 15 U.S.C. § 45(a)(2) deprives the FTC of regulatory jurisdiction over 'common carriers subject to the Acts to regulate commerce.'" AT&T's framing of its motion is incorrect. The FTC's statutory authority to bring claims against AT&T has no bearing on the district court's jurisdiction to consider the FTC's Complaint. *See United States v. Alisal Water Corp.*, 431 F.3d 643, 650 (9th Cir. 2005). The district court had jurisdiction over the FTC's claims even if the FTC lacked the statutory authority to bring those claims. AT&T's motion, in other words, raises a Rule 12(b)(6) issue, not a Rule 12(b)(1) issue.

Acts to regulate commerce." 15 U.S.C. § 45(a)(2). Section 5 states:

> The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of Title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C.A. § 181 et seq.], except as provided in section 406(b) of said Act [7 U.S.C.A. § 227(b) ], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

*Id.* "Common carrier" is not defined in the FTC Act. "Acts to regulate commerce" are defined as the Interstate Commerce Act of 1887, the Communications Act of 1934, and "all Acts amendatory thereof and supplementary thereto." 15 U.S.C. § 44. When section 5 was enacted, only the Interstate Commerce Act was included within the term "Acts to regulate commerce." The Communications Act was added to the definition of "Acts to regulate commerce" after its passage. *See* Wheeler-Lea Act § 2, 52 Stat. 111 (1938).

The issue presented to us is whether the common carrier exemption in section 5 is status-based, such that an entity is exempt from regulation as long as it has the status of a

common carrier under the "Acts to regulate commerce," or is activity-based, such that an entity with the status of a common carrier is exempt only when the activity the FTC is attempting to regulate is a common carrier activity.

AT&T advocates a status-based interpretation of the exemption, arguing that its status as a common carrier under the Communications Act shields it from liability under section 5 even as to non-common carrier activity. According to AT&T, the common carrier exemption bars the FTC from in any way regulating an entity with the status of a common carrier under section 5, even if the common carrier engages in non-common carrier activity.

The FTC, on the other hand, contends that the exemption should be read as activity-based, arguing that an entity is shielded from section 5 liability only to the extent it has the status of a common carrier and the activity at issue is a common carrier activity. According to the FTC, AT&T is not exempt from section 5 liability in this case because mobile data service was not a common carrier activity at the time of AT&T's alleged violations.

We conclude, based on the language and structure of the FTC Act, that the common carrier exception is a status-based exemption and that AT&T, as a common carrier, is not covered by section 5.

In interpreting a statute, we first consider the language of the statute itself. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). The plain language of the common carrier exemption casts the exemption in terms of status, contrary to the FTC's position. The phrase "common carriers subject to the Acts to regulate commerce," 15 U.S.C.

§ 45(a)(2), does not contain any language suggesting that the activities of a common carrier affect the exemption's application. A literal reading of the words Congress selected simply does not comport with an activity-based approach. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to 'presume that the legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)) (brackets omitted)).

The common carrier exemption is surrounded by exemptions for "banks," "savings and loan institutions," and "Federal credit unions," all of which the FTC acknowledges are status-based exemptions even though phrased in similar terms as the common carrier exemption it contends is activity-based. The fact that surrounding exemptions are defined in terms of status suggests that "common carriers subject to the Acts to regulate commerce" also carves out a group of entities based on status.

In adopting the FTC's view of the common carrier exemption, the district court concluded that the term "common carrier" was understood to encompass both a status and an activity prior to enactment of the FTC Act. It based this conclusion on a number of Supreme Court cases identifying a regulatory distinction for common carriers between common carrier and non-common carrier activities. In *Santa Fe, Prescott & Phoenix Railway Company v. Grant Brothers Construction Company*, 228 U.S. 177 (1913), for example, the Court noted "the established doctrine . . . that common carriers cannot secure immunity from liability for their negligence by any sort of stipulation," but explained that "this rule has no application when a railroad company is

acting outside the performance of its duty as a common carrier." *Id.* at 184, 185. Likewise, in *Railroad Company v. Lockwood*, 84 U.S. 357 (1873), the Court stated that an entity is a common carrier when it carries articles as part of its "regularly established business," but may "become a private carrier, or a bailee for hire, when . . . [it] undertakes to carry something which it is not [its] business to carry." *Id.* at 377. Prior to the enactment of the FTC Act, the Supreme Court also recognized that common carriers fell outside the scope of the Interstate Commerce Act to the extent they engaged in non-common carrier activities. *See Kansas City S. Ry. Co. v. United States*, 282 U.S. 760, 764 (1931) ("There is no doubt that common carriers, subject to the Interstate Commerce Act, may have activities which lie outside the performance of their duties as common carriers and are not subject to the provisions of the act."); *Interstate Commerce Comm'n v. Goodrich Transit Co.*, 224 U.S. 194, 211 (1912) (noting that non-common carrier activities are not within the Interstate Commerce Commission's jurisdiction).

While these cases recognize a distinction between common carrier and non-common carrier activities in the regulation of entities with common carrier status, they do not show that when Congress used the term "common carrier" in the FTC Act, it could only have meant "common carrier to the extent engaged in common carrier activity." There is no indication that the regulatory distinction in the cases the district court cited is implicit in Congress's phrasing of the common carrier exemption.

Moreover, awareness of the potential duality of common carriers pre-FTC Act may actually cut against the FTC's argument. Given the "presum[ption] that Congress is aware of 'past judicial interpretations and practices' when it

legislates," *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 720 (9th Cir. 2010) (quoting *In re Egebjerg*, 574 F.3d 1045, 1050 (9th Cir. 2009)), it would be expected that Congress would have been more precise in its language if it intended the FTC to retain regulatory authority over a common carrier's non-common carrier activity.

A status-based interpretation of the common carrier exemption also derives significant support from the language of the Packers and Stockyards exemption. Section 5 of the FTC Act exempts "persons, partnerships, or corporations *insofar as they are subject* to the Packers and Stockyards Act, 1921." 15 U.S.C. § 45(a)(2) (emphasis added). The "insofar as" language, clearly indicative of an activity-based approach, undermines the plausibility of the FTC's argument that the exemption for "common carriers subject to the Acts to regulate commerce" requires an activity-based interpretation. The language of the common carrier exemption meaningfully varies from that of the Packers and Stockyards exemption. *See S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("[T]he use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words. . . . Congress's explicit decision to use one word over another in drafting a statute is material. . . . It is a decision that is imbued with legal significance and should not be presumed to be random or devoid of meaning.").

## B.

The FTC argues that the "insofar as" language in the Packers and Stockyards exemption in section 5 of the FTC Act, which on its face clearly indicates Congress's intent to adopt an activity-based approach for that exemption (and

therefore, by contrast, indicates that Congress intended to retain a status-based interpretation of the common carrier exemption) actually does not indicate such an intent. The FTC bases this argument on the legislative history of the Packers and Stockyards exemption, but this argument is unpersuasive. To the contrary, our understanding of the statute based on its plain language is bolstered by examination of the statutory history of the Packers and Stockyards exemption and of the FTC's own decisions prior to an amendment of that exemption.

As originally enacted, "persons, partnerships, or corporations *subject to* the Packers and Stockyards Act" were exempted from liability. Wheeler-Lea Act § 3, 52 Stat. 111, 111–12 (1938) (emphasis added). In 1958, Congress amended the exemption to contain the "insofar as" language present today. *See* Pub. L. No. 85-909, § 3, 72 Stat. 1749, 1750 (1958). The FTC contends that the Packers and Stockyards exemption was always activity-based and that the amendment was merely a part of a Congressional effort to clarify the jurisdictional responsibilities of the FTC versus the Secretary of Agriculture. It is unnecessary to rely on legislative history to construe unambiguous statutory language, *see Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012) ("If the statutory language is unambiguous and the statutory scheme is coherent and consistent, judicial inquiry must cease." (quoting *In re Ferrell*, 539 F.3d 1186, 1190 n.10 (9th Cir. 2008))). But even considering the FTC's arguments, the legislative history does not bear out the FTC's claims. The relevant House Report stated that the bill "deals with a reassignment of jurisdiction over unfair trade practices." H.R. Rep. No. 85-1507, at 3. If the amendment had merely been a clarification of the FTC's authority, it is unlikely that

the amendment would have been characterized as a jurisdictional "reassignment."

The House Report also suggested a status-based understanding of existing law, stating that "[u]nder present law, the Secretary of Agriculture has exclusive jurisdiction over all unfair trade practices engaged in by packers." *Id.* at 3. The Report noted that "the Secretary has jurisdiction over unfair trade practices in the sale by packers of many articles (such as sporting goods) which are either not at all or only remotely related to agricultural products," while "the Federal Trade Commission does not have jurisdiction over many of the large national grocery chains by reason of their ownership of a 20 percent or more interest in packinghouses." *Id.* at 3, 4. If the Packers and Stockyards exemption was truly activity-based prior to its amendment, these statements would have made little sense.

The FTC points to *Food Fair Stores, Inc.*, 54 F.T.C. 392 (1957), in support of its argument that the Packers and Stockyards Act and the corresponding exemption in the FTC Act were understood to be activity-based prior to the 1958 amendment, such that the 1958 amendment is of no consequence to its position. Although the FTC stated in *Food Fair Stores* that "Congress has not removed all activities of packers from the jurisdiction of the Federal Trade Commission, as has been done in the Federal Trade Commission Act in the case of banks," the decision nonetheless acknowledged that the FTC lacked jurisdiction over the non-packer activities of entities subject to the Packers and Stockyards Act. The FTC stated:

> It seems clear from the language of the
> [Packers and Stockyards] Act and from the

legislative history that Congress designedly
made the definition of packer a very broad
one. The general purpose was to regulate
certain practices of the meat packing business
in all its ramifications regardless of its
organization or unrelated activities. About the
only persons Congress seemed to exempt
were those having no packer affiliations.
Thus, an independent tanner would not be a
packer, merely because of being in the tannery
business. Nor would an independent
marketer, simply because he marketed meats,
meat food products and livestock products,
etc. But if either engaged in certain activities
traditionally connected with the packing
business, or had a designated degree of
affiliation therewith, they were included in the
definition of packer.

*Id.* at 405. The FTC rejected the argument that "the
jurisdiction of the Secretary of Agriculture does not extend to
those products not associated with [an entity's] packing
business" in concluding that the grocery chain at issue fell
within the definition of "packer" and was therefore subject to
the Secretary of Agriculture's jurisdiction. *Id.* at 406, 408.

In reaching that conclusion, the FTC cited its own
decision from one year earlier, *Armour & Co.*, 52 F.T.C. 1028
(1956), in which it dismissed a complaint regarding a
packer's advertising of oleomargarine. In concluding that the
Secretary of Agriculture had jurisdiction and the FTC did not,
the FTC traced the relevant legislative history of the Packers
and Stockyards Act, noting that it reflected Congress's
intention to encompass a packer's unrelated activities within

its general regulation of packers. *Id.* at 1034–36. The FTC's opinions prior to amendment of the Packers and Stockyards exemption in 1958 appear more consistent with our understanding of the statutory text than with the FTC's current arguments.

The FTC also fails to adequately explain what motivation Congress would have had to amend the Packers and Stockyards exemption in 1958 if that exemption was at that time already understood to be activity-based. The FTC links the amendment to *Food Fair Stores*, but it makes little sense for Congress to have amended the Packers and Stockyards Act and the FTC Act exemption if, as the FTC argues, *Food Fair Stores* merely reaffirmed that the FTC retained some jurisdiction over packers. *See Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995))). The more likely explanation is that *Food Fair Stores* took a status-based approach to the Packers and Stockyards Act that Congress squarely addressed in 1958 by "reassign[ing]" jurisdiction over unfair trade practices between the FTC and the Secretary of Agriculture. H.R. Rep. No 85-1507, at 3.

The district court relied on *Crosse & Blackwell Co. v. FTC*, 262 F.2d 600 (4th Cir. 1959), to reject AT&T's argument regarding the significance of the 1958 amendment. In *Crosse*, the Fourth Circuit concluded that Crosse & Blackwell, a canner of soups and similar products, was not exempt from the FTC Act simply because products responsible for something less than three per cent of its annual sales contained meat, thus rejecting the argument that the company's processing of that meat made it wholly subject

to regulation by the Secretary of Agriculture. It reached that result by interpreting the pre-1958 Packers and Stockyards Act and FTC Act exemption to be activity-based, stating that "it was never intended that relatively inconsequential activity which might be classified as meat packing should insulate all of the other activities of a corporation from the reach of the Federal Trade Commission." *Id.* at 605. The opinion explicitly acknowledged that it was rejecting "a literal interpretation" of the FTC Act exemption, stating that it "must be laid aside for it is 'plainly at variance with the policy of the legislation as a whole.'" *Id.* (quoting *Ozawa v. United States*, 260 U.S. 178, 194 (1922)). Instead, the court relied on its view of Congress's "apparent purpose and intention" in enacting the Packers and Stockyards Act, namely to regulate "the businesses of the stockyards and of the packers as those industries were known and understood at the time." *Id.* at 604, 606. It observed that Congress, when it enacted the Packers and Stockyards Act, had not anticipated that entities would acquire packing businesses in order to wholly escape regulation by the FTC. *Id.* at 604–05. According to the Fourth Circuit, Congress's attention was focused solely on the businesses of packers and stockyards as such, and it would not have made sense for Congress to "saddle[] [the Secretary of Agriculture] with responsibility in areas far beyond the bounds of his concern." *Id.* at 606.

Although *Crosse* supports the FTC's interpretation of the pre-1958 Packers and Stockyards exemption, it does not do so persuasively. For one thing, the facts are obviously dissimilar. AT&T's status as a common carrier is not based on its acquisition of some minor division unrelated to the company's core activities that generates a tiny fraction of its revenue. More broadly, the *Crosse* decision seems to be based on little more than the court's own view of the most

effective regulatory regime in explicit disregard of the words of the statute. But the text of a statute cannot be disregarded in that manner. "It is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended." *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010). That is a job for Congress, not the courts. In addition, the legislative history relied upon in the *Crosse* opinion is limited to the origin of the Packers and Stockyards Act of 1921, with no attention to the history or language of the more directly relevant statute, section 5 of the FTC Act. Both the relevant text and a more careful review of that statute's legislative history demonstrate that when the statute exempted entities "subject to" the Packers and Stockyards Act, as it did prior to 1958, the Packers and Stockyards exemption was status-based. When it was amended in that year to exempt entities "insofar as they are subject" to the Packers and Stockyards Act, the exemption became activity-based. The other exemptions in section 5, including the exemption for common carriers, were not altered, however, and they remained status-based, then and now.

In denying AT&T's motion to dismiss, the district court relied on legislative history for the more pertinent statute, the FTC Act, citing a statement made during the debate over the House bill that later became the FTC Act. Representative Stevens stated:

> I have no doubt that there are many financial institutions of that sort in this country which are engaged in some industrial pursuit that would come within the scope of this act. . . . They ought to be under the jurisdiction of this commission in order to protect the public, in

order that all of their public operations should
be supervised, just the same as where a
railroad company engages in work outside of
that of a public carrier. . . . [E]very
corporation engaged in commerce except
common carriers, and even as to them I do not
know but that we include their operations
outside of public carriage regulated by the
interstate-commerce acts.

51 Cong. Rec. 8996 (May 21, 1914).

The FTC contends that Representative Stevens "plainly
envisioned an activity-based reading of the exception," but
his statement was equivocal on its face. What he actually
said was "I do not know," reflecting possible uncertainty in
Representative Stevens's mind as to the actual scope of the
bill. Moreover, even if Representative Stevens favored an
activity-based reading of the common carrier exemption, his
statement represented the understanding of only one member
of Congress, not a powerful or persuasive indicator of
Congress's intent. *See New Eng. Power Co. v. New
Hampshire*, 455 U.S. 331, 342 (1982) ("Reliance on such
isolated fragments of legislative history in divining the intent
of Congress is an exercise fraught with hazards, and 'a step
to be taken cautiously.'" (quoting *Piper v. Chris-Craft Indus.,
Inc.*, 430 U.S. 1, 26 (1977))). The FTC does not cite to any
other portion of the FTC Act's legislative history to support
its position.

### C.

The district court also concluded that the FTC's interpretation, though not entitled to *Chevron* deference,[5] was entitled to some deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Under *Skidmore*, non-binding agency opinions may be entitled to deference, with "[t]he weight of such a judgment in a particular case . . . depend[ent] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 140.

It is true, as the district court noted, that the FTC has in recent years interpreted the common carrier exemption as activity-based. *See e.g.*, *FTC-FCC Consumer Protection Memorandum of Understanding*, at 2 (Nov. 16, 2015); *Broadband Connectivity Competition Policy*, FTC Staff Report, at 38 (June 2007); *Prepared Statement of the Fed. Trade Comm'n*, 2003 WL 21353573, at *19 (2003); *FTC Reauthorization, Hearing Before the Subcommittee on Consumer Affairs, Foreign Commerce and Tourism*, S. Hrg. 107-1147, at 28 (2002) (statement of Hon. Sheila F. Anthony, FTC). Under such circumstances, *Skidmore* deference may be appropriate. We conclude, however, that even if the agency's interpretation is entitled to some deference under *Skidmore*, such deference is insufficient to overcome the factors that point strongly in favor of AT&T's position. Given the language of the common carrier exemption and the

---

[5] The FTC has not argued that *Chevron* deference is appropriate in this case. The FTC explicitly disclaimed any reliance on *Chevron* before the district court. *See AT&T Mobility LLC*, 87 F. Supp. 3d at 1101.

structure of the FTC Act, we are not persuaded by the FTC's interpretation.

Because we conclude that the common carrier exemption is a status-based exemption that excludes AT&T from section 5's coverage, we need not address AT&T's remaining arguments regarding overlapping regulation and the effect of the FCC's Reclassification Order.

III.

The common carrier exemption in section 5 of the FTC Act carves out a group of entities based on their status as common carriers. Those entities are not covered by section 5 even as to non-common carrier activities. Because AT&T was a common carrier, it cannot be liable for the violations alleged by the FTC. The district court's denial of AT&T's motion to dismiss is reversed, and the case is remanded for entry of an order of dismissal.

**REVERSED AND REMANDED.**